IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-703

Filed 6 May 2026

Guilford County, No. 25CV005050-400

COLEMAN FRAZIER
BRIANA HESTER
DANIEL STANBACK
ELLA STANBACK,

        Plaintiffs,

      v.

TITLEMAX OF VIRGINIA, INC., and TITLEMAX OF SOUTH CAROLINA, INC.,

        Defendants.

Appeal by defendants from order and judgments entered 27 May 2025 by Judge R. Stuart Albright in Guilford County Superior Court. Heard in the Court of Appeals 24 February 2026.

*Brown, Faucher, Peraldo & Benson PLLC, by James R. Faucher, Drew Brown, and Kevin Rust, for plaintiffs-appellees.*

*Ellis & Winters LLP, by Andrew S. Chamberlin, and Venable LLP, by Abram I. Moore, Nelson M. Hua, and Daniel J. Hayes, pro hac vice, for defendants-appellants.*

ZACHARY, Judge.

Defendants TitleMax of Virginia, Inc., and TitleMax of South Carolina, Inc., (collectively, "TitleMax") appeal from 1) an order denying vacatur and confirming the Arbitration Awards entered in favor of Plaintiffs; and 2) the judgments entered in favor of Plaintiffs. After careful review, we affirm.

## I.      <u>Background</u>

TitleMax made consumer car title loans to Plaintiffs, all of whom are North Carolina residents. A title loan is a "loan[ ] secured by a motor vehicle." *Leake v. AutoMoney, Inc.*, 284 N.C. App. 389, 391, 877 S.E.2d 22, 27 (2022), *disc. review denied*, 384 N.C. 190, 884 S.E.2d 738 (2023). Although legal under South Carolina and Virginia law—the states in which the subject TitleMax stores are located—the types of loans offered by TitleMax were prohibited in North Carolina at the time they were made: "[t]he highest rate of interest permitted by N.C. Gen. Stat. § 53-176(a), at the relevant time, was 30% per annum on loans not exceeding $15,000.[00]."[1]

Plaintiff Frazier entered into a loan agreement with TitleMax for $1,020.00 at 143.00% per annum and a subsequent loan agreement for $4,000.00 at 143.11% per annum. To secure each loan, TitleMax placed a lien on Plaintiff Frazier's vehicle and recorded the liens with the North Carolina Department of Motor Vehicles ("DMV") to perfect its security interests.

Plaintiff Hester entered into a loan agreement with TitleMax for $1,932.00 at 189.43% per annum and an additional loan agreement for $2,172.00 at 192.38% per annum; the Stanback Plaintiffs entered into a loan agreement with TitleMax for $680.00 at 204.79% per annum. As in Plaintiff Frazier's case, TitleMax secured its

---

[1] The North Carolina legislature has since amended portions of the North Carolina Consumer Finance Act, of which this section is a part. Effective 1 October 2023, the highest legal interest rate permitted for installment loans not exceeding $12,000.00 that are not secured by a deed of trust or mortgage is 33% per annum. N.C. Gen. Stat. § 53-176(a)(1) (2025).

loans to Plaintiff Hester and the Stanback Plaintiffs by placing liens on their respective vehicles as collateral and recording the liens with the DMV to perfect its security interests.

Plaintiffs traveled from North Carolina to either a Virginia or South Carolina TitleMax store, where their vehicles were appraised and they discussed the terms of the loans with TitleMax employees, executed the loan contracts, and received the loan proceeds.

Each of the loan contracts (the "Loan Agreements") contained similar terms: the lender and borrower agreed that most disputes would be resolved by a third-party arbitrator following the JAMS[2] arbitration rules, and each Loan Agreement contained a "Governing Law" provision specifying that either Virginia or South Carolina "law governs this Note, but the Federal Arbitration Act governs the Waiver of Jury Trial and Arbitration Clause."

Nonetheless, the record reveals that TitleMax had significant contacts with North Carolina. The DMV records reveal that as of 16 January 2020, TitleMax employees traveled to and recorded over 50,000 liens in North Carolina—for which TitleMax charged each customer a lien fee. In addition to using the DMV to perfect its security interests in the vehicles, TitleMax employees solicited business, discussed

---

[2] JAMS is a "provider of alternative dispute resolution (ADR) services" for "business and legal disputes at any stage of conflict." *About Us*, https://www.jamsadr.com/about (last visited 1 April 2026).

loan terms, received payment from debtors, and repossessed automobiles in North Carolina.

On 9 April 2020, Plaintiffs filed individual suits against TitleMax in North Carolina state court, alleging that the Loan Agreements violated the North Carolina Consumer Finance Act ("CFA") (N.C. Gen. Stat. § 53-164 et seq.); North Carolina usury laws (N.C. Gen. Stat. § 24-1 et seq.); and the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") (N.C. Gen. Stat. § 75-1.1 et seq.). Plaintiffs' actions were removed to federal court, consolidated, and ordered to arbitration on 10 May 2020.

Plaintiffs prevailed at arbitration. Plaintiff Frazier received a Final Award of $47,245.34 on 3 March 2025. Plaintiff Hester received a Final Award of $31,393.79 on 3 March 2025. The Stanback Plaintiffs received a Final Award of $18,079.12 on 26 February 2025.

On 4 March 2025, Plaintiffs filed a complaint against TitleMax in Guilford County Superior Court seeking confirmation of the Arbitration Awards and entry of judgment "consistent with the Awards," together with interest and attorney's fees as provided by law. On 4 April 2025, TitleMax filed motions to vacate the Plaintiffs' Arbitration Awards. TitleMax alleged that the Loan Agreements "each contain an unambiguous and enforceable choice-of-law provision confirming" that either South Carolina or Virgina law governed the Loan Agreements; therefore, because the arbitrators applied North Carolina law, they "exceeded [their] powers." (Citation

omitted). TitleMax sought vacatur of the Arbitration Awards, denial of Plaintiffs'

motion for confirmation and judgment, and dismissal of Plaintiffs' complaint.

The matter came on for hearing on 12 May 2025, and on 27 May 2025, the trial

court entered an order granting Plaintiffs' motion to confirm and denying TitleMax's

motions to vacate. The trial court concluded that "[n]one of the arbitrators exceeded

their authority in issuing the Arbitration Awards" and that the "Awards did not fail

to draw their essence from the agreements, as each directly construed the Governing

Law provision." That same day, the court entered separate judgments consistent with

the Arbitral Awards in favor of Plaintiffs.

TitleMax entered timely notice of appeal.

## II.    Discussion

TitleMax raises two issues on appeal: whether (1) "[t]he trial court erred by

denying vacatur and confirming the Awards, which all failed to draw their essence

from the relevant Loan Agreement(s)"; and (2) "[t]he trial court further erred by

confirming the Awards based on reasons not stated in the Awards." We address each

argument in turn.

### A. *Applicable Law and Standard of Review*

It is well settled that "[j]udicial review of an arbitration award is severely

limited in order to encourage the use of arbitration and in turn avoid expensive and

lengthy litigation"; accordingly, "an arbitration award is presumed valid, and the

party seeking to vacate it must shoulder the burden of proving the grounds for

attacking its validity." *First Union Secs., Inc. v. Lorelli*, 168 N.C. App. 398, 400, 607 S.E.2d 674, 676 (2005) (citations omitted). The "general rule [is] that errors of law or fact, or an erroneous decision of matters submitted to arbitration, are insufficient to invalidate an award fairly and honestly made." *Turner v. Nicholson Props., Inc.*, 80 N.C. App. 208, 212, 341 S.E.2d 42, 45 (cleaned up), *disc. review denied*, 317 N.C. 714, 347 S.E.2d 457 (1986). In short, an erroneous legal or factual determination will not justify the vacatur of an arbitrator's award. *See Smith v. Young Moving & Storage, Inc.*, 167 N.C. App. 487, 489–90, 606 S.E.2d 173, 175–76 (2004) ("Where an arbitrator makes such a mistake, it is the misfortune of the party." (cleaned up)).

As the parties acknowledge, "this arbitration dispute involves a contract affecting interstate commerce, and thus is governed by the Federal Arbitration Act (FAA)." *Lorelli*, 168 N.C. App. at 399, 607 S.E.2d at 676.[3] "According to well-established law, when an action is brought under a Federal statute"—such as the FAA—"in so far as it has been construed by the Supreme Court of the United States, we are bound by that construction." *Snipes v. TitleMax of Va., Inc.*, 285 N.C. App. 176, 183, 876 S.E.2d 864, 870 (2022) (cleaned up), *disc. review denied*, 384 N.C. 191, 884 S.E.2d 740 (2023). The lower federal court opinions "may be considered persuasive authority in interpreting a federal statute." *Id.* at 184, 876 S.E.2d at 870 (citation omitted).

---

[3] Each Loan Agreement states: "This Note and the Loan involve interstate commerce."

Pursuant to 9 U.S.C. § 10(a) (2026), vacatur of an arbitrator's decision is permitted only under the following limited circumstances:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any part have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

"[T]he standard of review of the trial court's vacatur of an arbitration award . . . is the same as for any other order in that we accept findings of fact that are not clearly erroneous and review conclusions of law de novo." *Snipes*, 285 N.C. App. at 184, 876 S.E.2d at 870 (cleaned up).

### B. *Essence of the Loan Agreements*

TitleMax first argues that "[t]he trial court erred by denying vacatur and confirming the Awards, which all failed to draw their essence from the relevant Loan Agreement(s)." We disagree.

The "essence of the contract is a doctrine that fits with the FAA provision allowing for vacatur where the arbitrators 'exceeded their powers.' " *Id.* at 186, 876 S.E.2d at 871 (italics omitted) (quoting 9 U.S.C. § 10(a)(4)). "The bar for an

arbitrator's award drawing its essence from a contract is low; the arbitrator need only be arguably construing or applying the contract." *Id.* (cleaned up); *see also Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 573, 186 L. Ed. 2d 113, 122 (2013) ("Under § 10(a)(4), the question for a judge is not whether the arbitrator construed the parties' contract correctly, but whether he construed it at all.").

In the case at bar, each of the Loan Agreements contains a generic choice-of-law clause providing that either South Carolina or Virginia law "governs this Note." Nonetheless, each arbitrator applied North Carolina law. TitleMax contends that "[w]here parties direct an arbitrator to apply one state's law, and the arbitrator applies another state's law, the arbitrator has exceeded the authority given by the parties." Plaintiffs respond that the arbitrators had the authority to determine the enforceability of the contracts and that the generic governing-law provision did not apply to Plaintiffs' extra-contractual statutory and tort claims; accordingly, the Arbitral Awards did not fail to draw their essence from the contracts nor did the arbitrators exceed their powers. For the following reasons, we agree with Plaintiffs.

*The Enforceability of the Contracts*

The United States Supreme Court addressed whether an arbitrator may declare void a contract that contains an arbitration clause subject to the FAA in *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 442, 163 L. Ed. 2d 1038, 1041 (2006). In *Buckeye*, two individuals filed suit against a lender, advancing claims for usury and violations of various Florida lending and consumer-protection laws. *Id.* at

443, 163 L. Ed. 2d at 1042. The loan agreement provided for arbitration, which the respondents opposed on the ground that the loan agreement was void. *Id*. at 448, 163 L. Ed. 2d at 1045. The Supreme Court concluded that "a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator." *Id.* at 449, 163 L. Ed. 2d at 1046. In other words, a general challenge to a contract containing an arbitration provision falls within the province of the arbitrator. Thus, an arbitrator may determine whether a contract is void or unenforceable without exceeding his powers in violation of 9 U.S.C. § 10(a)(4).

*The Governing-Law Provision*

In the instant case, each Loan Agreement provides that either South Carolina or Virginia "law governs this Note." The parties disagree as to the proper characterization of Plaintiffs' claims as sounding in contract or tort and whether the claims fall within the scope of the choice-of-law provision. TitleMax argues that this choice-of-law provision encompasses all of Plaintiffs' claims, while Plaintiffs maintain that the provision is limited to contractual claims and therefore does not cover their statutory and tort claims.

The Loan Agreements' choice-of-law clause is generic; that is, it simply provides that the contract shall be "governed by" the law of a particular state without specifically providing that the clause governs "[a]ny and all claims arising from or relating to" the Agreements. *See, e.g.*, Tanya Monestier, *The Scope of Generic Choice of Law Clauses*, 56 U.C. Davis L. Rev. 959, 968–72 (2023) (identifying four broad

categories of choice-of-law clauses, including generic clauses, which "tend to provide fodder for litigation"). *See also* Restatement (Second) of Confl. of L. § 187 cmt. c (A.L.I. 1971) ("The parties, generally speaking, have power to determine the terms of their contractual engagements. They may spell out these terms in the contract. In the alternative, they may incorporate into the contract by reference extrinsic material which may, among other things, be the provisions of some foreign law."); *id.* § 188 cmt. b (observing that "the protection of the justified expectations of the parties is of considerable importance in contracts whereas it is of relatively little importance in torts").

The caselaw regarding the scope of a generic choice-of-law provision is unsettled, with the courts divided as to whether a generic choice-of-law clause only applies to contractual claims or more broadly applies to statutory and tort claims that relate to the contract. *See generally* Monestier, at 973 (noting "the lack of clarity on what law governs" the determination of whether a generic choice-of-law clause encompasses non-contractual claims arising between the parties: the law of the forum or the parties' chosen law); Restatement (Second) of Confl. of L. § 188 cmt. b ("In the torts area, it is the rare case where the parties give advance thought to the law that may be applied to determine the legal consequences of their actions. On the other hand, parties enter into contracts with forethought and are likely to consult a lawyer before doing so.").

Given this split of authority, it is unclear whether Plaintiffs' claims against

TitleMax fell within the ambit of the Loan Agreements' choice-of-law clause. In wrestling with this issue, an arbitrator could have reasonably interpreted the provision either way. Yet we are not tasked with determining whether the arbitrator correctly interpreted the choice-of-law clause. The dispositive issue under 9 U.S.C. § 10(a)(4) is "whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong." *Oxford Health Plans*, 569 U.S. at 569, 186 L. Ed. 2d at 119; *see also Snipes*, 285 N.C. App. at 186, 876 S.E.2d at 871.

Here, it is clear that the arbitrators "arguably constru[ed]" the choice-of-law provision in determining that North Carolina law applied. *Snipes*, 285 N.C. App. at 186, 876 S.E.2d at 871 (citation omitted). In making the Awards, each of the arbitrators recognized that the Loan Agreement contained a choice-of-law provision; considered whether the choice-of-law provision frustrated the prosecution of Plaintiffs' statutory and tort claims; and explained why—despite the choice-of-law provision—North Carolina law applied. The Frazier Award contains an entire section denominated "Choice of Law Analysis," in which the arbitrator concluded that "applying any choice of law analysis, the CFA and the UDTPA apply to the Loan Agreements, and no choice of law analysis bars [Plaintiff Frazier]'s claims under the CFA or UDTPA." The Hester Award contains a section titled "Is the Choice of Law Provision in the Loan Agreements Enforceable?", and the Stanback Award likewise addresses the choice-of-law provision.

At minimum, the arbitrators "arguably constru[ed]" the choice-of-law provision

in the contracts. *Id.* (citation omitted). Therefore, the Arbitration Awards did not fail to draw their essence from the parties' contracts and the arbitrators did not exceed their powers in violation of 9 U.S.C. § 10(a)(4). The trial court properly confirmed the Awards.

### C. *Basis for Arbitral Awards*

TitleMax next argues that the trial court erred "by confirming the Awards based on reasons not stated in the Awards." Specifically, as to each Award, TitleMax challenges the court's determination that the respective "[a]rbitrator 'construed' the choice of law provision and found that . . . it does not apply" to Plaintiffs' claims.

In confirming the Awards, the court determined that each arbitrator properly performed his or her role in this matter, concluding that "[i]t [wa]s enough that the arbitrators construed the 'Governing Law' provision at all, as the Arbitration Awards demonstrate that each arbitrator did." (Citing *id.*). For the reasons explained above, we agree with the trial court.

It was not necessary that each arbitrator explicitly analyze the scope of the choice-of-law clause when it is manifest that the arbitrators expressly construed the choice-of-law clause. As discussed above, the arbitrators "arguably constru[ed]" the relevant provisions in the contracts, which is all that is required. *Id.* (citation omitted). Therefore, the arbitrators did not exceed their authority under the FAA. TitleMax's argument to the contrary is overruled.

### III.    Conclusion

We conclude that the arbitrators did not exceed their authority because they construed the choice-of-law provision contained in each Loan Agreement and thus, the resulting Arbitration Awards did not fail to draw their essence from the Loan Agreements. Accordingly, we affirm 1) the trial court's order confirming Plaintiffs' Arbitration Awards and denying TitleMax's motions to vacate, and 2) the court's individual judgments entered against TitleMax and in favor of Plaintiff Frazier, Plaintiff Hester, and the Stanback Plaintiffs, respectively.

AFFIRMED.

Judges STROUD and GORE concur.